(No. 39531.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* WILLIAM E. McGUIRE, Appellant.

*Opinion filed September 23, 1966.*

220

William H. Henning, Public Defender, of Galesburg, for appellant.

William G. Clark, Attorney General, of Springfield, and Donald C. Woolsey, State's Attorney, of Galesburg,

(FRED G. LEACH, Assistant Attorney General, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

A jury in the circuit court of Knox County found the defendant, William E. McGuire, guilty of burglary, and the court sentenced him to a term of imprisonment of not less than eight nor more than twelve years. On this direct appeal he raises constitutional issues concerning the admission in evidence of an oral statement in which he acknowledged that he broke into the building in question. He relies upon *Escobedo* v. *Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, and contends that the admission of this statement deprived him of his constitutional right to counsel. Apart from *Escobedo*, he also contends that his statement was involuntary and its admission deprived him of due process of law.

The defendant was charged with the burglary of a building occupied by the E. W. Houghton Lumber Company at Altona, Illinois, on August 29, 1964. Miles Baysinger testified that he lived a little over a block from the premises of the lumber company; that about 11:30 P.M. on August 29, 1964, he heard noises "like an explosion." He went to the front door and saw Harold Swanson, the night marshal of the village, marching the defendant down the road at gun point. At the marshal's request, Baysinger searched the defendant and took from his pockets a screw driver and a pair of gloves. Both the marshal and the defendant were bleeding. The defendant had been shot in the leg, and the marshal had been shot in the hip and in the body. Before the marshal "slumped down," he handed his gun to Baysinger and asked him to hold the defendant until the sheriff came. The marshal and the defendant were taken to a hospital at Galesburg. The defendant was given emergency treatment, and remained in a room in the hospital from approximately 1:30 A.M. on August 30 until 2:30 P.M. on

August 31, when he was taken before a magistrate for a preliminary hearing. The defendant's oral statement which was received in evidence was made in his room in the hospital, at 9:30 A.M. on August 31, in the presence of Deputy Sheriff Marion Stewart and Mrs. Barbara Gans, a registered nurse at the hospital.

The defendant's first contention is based primarily upon the decision of the Supreme Court of the United States in *Escobedo* v. *Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977. He argues that his statement should not have been received in evidence because it was obtained prior to his first appearance before a judge, at a time when he was in police custody and was the sole suspect, but had not been effectively warned of his constitutional right to remain silent and his right to the assistance of counsel. He also contends that because there is no statutory provision for the appointment of counsel for an indigent defendant prior to his first appearance before a judge, he was deprived of his right to the assistance of counsel in violation of the sixth and fourteenth amendments to the constitution of the United States.

*Escobedo* v. *Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, was decided on June 22, 1964. It dealt with the privilege against self-incrimination and the right of a suspect to counsel during interrogation. When the case now before us was tried, the implications of *Escobedo* were not entirely clear, and different conclusions had been reached as to the necessity of a request for counsel during police interrogation. Compare *People* v. *Hartgraves,* 31 Ill.2d 375, 202 N.E.2d 33, and *Browne* v. *State,* 24 Wis.2d 491, 131 N.W.2d 169, with *People* v. *Dorado,* 62 Cal. 2d 338, 398 P.2d 361, and *People* v. *Dufour,* (R.I.) 206 A. 2d 82.

In *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 706-7, the Supreme Court again considered problems relating to police interrogation of suspects. It summarized its conclusions in the following terms: "[T]he prosecution may not use statements, whether exculpatory or inculpatory,

stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

In *Johnson* v. *New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 892, 893, the Supreme Court considered the extent to which its decisions in *Escobedo* v. *Illinois* and *Miranda* v. *Arizona* should be applied retroactively. The court held that the standards laid down in *Miranda* applied only to "persons whose trials had not begun as of June 13, 1966," the date upon which the court announced its decision in *Miranda.* As to the retroactive effect of *Escobedo,* the court said: "Apart from its broad implications, the precise holding of

Escobedo was that statements elicited by the police during an interrogation may not be used against the accused at a criminal trial, '[where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent * * *.' 378 U.S. at 490-491."

The Supreme Court thus limited its decision in *Escobedo* to the precise holding of the case, and this holding, the court decided, "is available only to persons whose trials began after June 22, 1964, the date on which Escobedo was decided." 384 U.S. 719, 16 L. Ed. 2d at 892.

The trial in the present case commenced on February 25, 1965, but the record contains no suggestion that the defendant requested an opportunity to consult with a lawyer, and therefore the automatic rule of *Escobedo* is not applicable. The right to an attorney during custodial interrogation, in the absence of a request, did not become operative until June 13, 1966, the date of the Supreme Court's decision in *Miranda* v. *Arizona*. We hold, therefore, that under the standards applicable to his trial, the defendant was not denied the assistance of counsel. In this State attorneys have been appointed to represent indigent defendants upon the trial of charges of felony for more than a century. (See *Vise* v. *County of Hamilton*, (1857) 19 Ill. 78.) These appointments were made without reference to statutory authorization. So long as an indigent defendant receives the assistance of counsel to which he is entitled, the means by which that assistance is provided is of no concern to him. Therefore, the defendant's contention that the absence of a statutory provision for the appointment of coun-

sel violated his constitutional rights need not be further considered.

The defendant also contends that his statement was inadmissible because certain statutory provisions were not complied with. Article 103 of the Code of Criminal Procedure of 1963 specifies that an arrested person has the right to remain silent, to communicate with a member of his family, and to consult an attorney. (Ill. Rev. Stat. 1963, chap. 38, pars. 103—1 to 103—8.) Section 103—7 of the Code provides that "every * * * person who is in charge of any jail, police station or other building where persons under arrest are held in custody pending investigation, bail or other criminal proceedings, shall post in a conspicuous place in such buildings, where it may be seen and read by persons in custody, a verbatim copy in the English langauge of the provisions of Sections 103—2, 103—3, 104—4, 109—1 and 110—4 of this Code." Section 103—8 provides that any peace officer who intentionally prevents the exercise of an accused of any right conferred by article 103 or who intentionally fails to perform any act required by the article is guilty of the offense of official misconduct and may be punished accordingly.

The defendant contends that because the notice referred to in section 103—7 was not posted in the hospital, his oral statement was inadmissible. We do not agree, for the statute seems clearly intended to apply only to buildings in which persons under arrest are customarily held. It is inapplicable to a case like this in which circumstances beyond the control of the police required that the defendant be kept in custody in a place not ordinarily used for that purpose. Moreover, article 103 provides its own sanction, and does not, in our opinion, contemplate the exclusion of evidence.

Our decision concerning these contentions does not establish the admissibility of the defendant's statement. The recent decision of the United States Supreme Court in

*Davis* v. *North Carolina,* 384 U.S. 737, 16 L. Ed. 2d 895, emphasizes that the absence of an attorney and the failure to advise a defendant of his right to remain silent are significant factors to be considered in determining the voluntariness of his confession. We proceed, therefore, to a consideration of the defendant's claim that his statement was inadmissible because it was involuntary.

Deputy Sheriff Stewart testified that at about 9:30 A.M. on August 31, he asked the defendant whether he would agree to give a statement. "I told him whatever he said, that at a later date, it could be used against him in any Court, whatever he said. I told him that he was entitled to have a lawyer if he wanted one; the whole procedure that we go through, advised him that if he didn't have funds that the Court would no doubt appoint the Public Defender. At that time he did not make any indication that he wanted to have a lawyer." After the defendant's statement had been reduced to writing, an insertion reciting that the defendant had been informed of his right to an attorney was added, and initialed by the defendant. The deputy thought that he had not specifically advised the defendant that he could remain silent. The defendant testified that deputy Stewart did not inform him either of his right to an attorney or of his right to remain silent.

There is in this case no claim that any physical force was used beyond that reasonably necessary to prevent the defendant's escape. The defendant does not assert that any promise of leniency was made to him, or that he requested to see anyone or that anyone who sought to see him was prevented from doing so. The critical issue is whether the defendant's will was "overborne" by excessive interrogation.

At the trial, the defendant, who was then thirty-four years old, testified that when he was fourteen, "I was playing with matches and I burned down some old buildings, * * * three to be exact." He was sent to the Institute of Juvenile Research in Chicago. There the doctors recom-

mended that he be committed to the Illinois Neuropsychiatric Institute, and he remained in the Institute for almost ten months. A year after his release, he committed a burglary for which he was sentenced to the Illinois State Penitentiary for a term of one to ten years. In 1955, approximately three years after his release from prison, he was apparently found incompetent to stand trial on a charge of stealing an automobile. He spent seven months in the Illinois Security Hospistal before he was tried for the offense, convicted, and sentenced to the penitentiary. He was released in 1963.

The record in this case includes reports of two psychiatric examinations which were made after the defendant had requested a determination of his competency to stand trial. Both psychiatrists concluded that the defendant was mentally competent to stand trial. One of the reports described the defendant as "without psychosis or mental defect. Emotionally immature, inadequate personality structure with underlying compensatory egocentric mechanisms, anti-social drives that clearly reflect a sociopathic orientation. Very superior intelligence." The same report stated: "There is no question but underlying the placid surface there is a tremendous degree of frustration, conflict and, in many ways, preschizophrenic thinking * * *."

Against this psychological background, we consider the conditions of the defendant's custody during the thirty-two hours that preceded his statement. The nurse, Mrs. Gans, testified that many police officers spoke to the defendant in addition to deputy Stewart. "There were several coming and going and I don't know how many were there at any one time. But they were there practically the whole day, at different times." She testified that police officers were in the room whenever the nurses went in. Both she and Deputy Sheriff Stewart testified that the defendant said that he felt the whole world was against him; that he had no friends and that everyone was trying to crush and destroy him. Mrs. Gans testified, "Many times he told us that he just

wanted to be left alone, that he wished people would leave him alone."

At the trial, the defendant testified that numerous State policemen had asked him whether he fired at Swanson. They told him that if Swanson died he would probably be charged with murder. A Galesburg police officer said to him, "If I had been up there where you had your altercation with Mr. Swanson I would have shot you in the head with four or five bullets. I don't have any conscience either and I would like to kill you."

The defendant also testified, "I felt that everyone in the place, including the people that worked there, were against me and trying to destroy me and to kill me. I also felt that there was no aid available to me and I wondered why my mother didn't come. I wept for hours because she didn't come to see me." He added that he was frightened and confused, and gave the statement because "I felt it didn't make any difference whether I did it or not, they were going to fasten it on me so I said what I did so they would leave me alone; they had been prodding me about this burglary. I knew nothing about it and I know nothing about it now."

The burden of proving that a confession was voluntary rests upon the State. (Ill. Rev. Stat. 1963, chap. 38, par. 114—11.) The defendant had a history of mental disturbance. The charge of prolonged interrogation by numerous policemen, coupled with a statement by one of the officers that he would like to kill the defendant, must be considered in the light of that history. If the defendant made his statement because he believed he was conspired against, would not receive a fair trial, and wanted relief from prolonged or excessive interrogation, that statement could not be considered voluntary.

Systematic evaluation of the evidence was made difficult in this case because critical evidence concerning the defendant's mental condition was not presented at the hearing on the defendant's motion to suppress his statement. Much of

the most significant evidence was presented either in connection with the defendant's motion to determine his competency to stand trial, or at the trial itself after the motion to suppress had been overruled. Probably for this reason, the prosecution did not attempt to refute that evidence, particularly by the testimony of officers who had been present at the hospital. With respect to the interrogation of the defendant it offered only the testimony of Mrs. Gans and Deputy Sheriff Stewart. In *Blackburn v. Alabama,* 361 U.S. 199, 4 L. Ed. 2d 242, 210, however, the Supreme Court ruled that when evidence establishing the involuntariness of a confession is received "at any stage" of a criminal trial, a conviction of the defendant based in part on the confession violates the fourteenth amendment.

Considerations of fairness may require that important evidence not be ignored, but there is a countervailing value in orderly procedure. We believe that this case should be remanded, not for a full new trial, but for a new hearing on the admissibility of the defendant's statement. At such a hearing both parties will have an opportunity to present further evidence. Compare *People v. Wright,* 30 Ill.2d 519; *People v. Beattie,* 31 Ill.2d 257; *People v. Jackson,* 31 Ill.2d 408.

Because we do not order a new trial, we must consider other errors alleged by the defendant. He maintains that the testimony of Miles Baysinger to the effect that the marshal was bleeding, and "slumped down" after he gave his gun to Baysinger, was erroneously received in evidence. He also maintains that two references to the shooting of the marshal, objections to which were sustained, deprived him of a fair trial. These contentions are answered by our ruling in *People v. Sustak,* 15 Ill.2d 115, in which we said: "While the details of a different crime than that charged would ordinarily be improperly received, where that separate crime indicates resistance to arrest for the crime charged, is in close proximity in time or locality or otherwise so associated,

the details thereof are properly received to show the force and vigor with which the one arrested so resisted, * * *. The details, therefore, are material to the evidence of resistance, and are indicative of and a measure of the consciousness of guilt. *People* v. *Spaulding*, 309 Ill. 292." 15 Ill.2d at 124.

The information upon which the defendant was tried charged him with "unlawful entry into a certain building occupied by the E. W. Houghton Lumber Company, with intent to commit a theft." He asserts the State failed to prove in a satisfactory manner that this concern was a corporation. Bernard A. Johnson testified at the defendant's trial that he had been manager of the Altona branch of the Houghton Lumber Company for about twenty years. He was asked whether the business was a corporation and answered, "Yes, sir." An objection to the question and to the answer was overruled. We believe that the trial court's ruling was correct and that the existence of the corporation was sufficiently demonstrated by Johnson's testimony.

We recognize that a long series of decisions of this court have held that more formal proof of a corporation's existence is essential to establish that the corporation has been burglarized. (*E.g.*, *People* v. *Nakutin*, 364 Ill. 563; *People* v. *Pernalsky*, 334 Ill. 38; *People* v. *Andrae*, 305 Ill. 530; *People* v. *Krittenbrink*, 269 Ill. 244; *People* v. *Fryer*, 266 Ill. 216; *People* v. *Mendelson*, 264 Ill. 453; see *Wallace* v. *People*, 63 Ill. 451.) The rules announced in these decisions were summarized in *People* v. *Panczko*, 381 Ill. 625, 628: "The methods of proving the existence of the corporation are: (1) by introducing the charter of the corporation or a certified copy thereof; or (2) by proving user. * * * User may be proved by showing that the alleged corporation had an office, operated its business through managers, cashiers and other officers; had a board of directors and president elected by the directors; and such additional acts as manifest corporate functioning."

Oral testimony that a business was a corporation has been held sufficient when no objection was raised at the time the evidence was presented. (*People* v. *Gordon*, 5 Ill.2d 91; *People* v. *Holtzman*, 1 Ill.2d 562; *People* v. *Novick*, 265 Ill. 436; *People* v. *Burger*, 259 Ill. 284.) Parol evidence has been considered insufficient, however, when an objection was raised, and the exception for evidence received without objection has sometimes been narrowly construed. Thus, in *People* v. *Struble*, 275 Ill. 162, testimony that the National Fireproofing Company did business "as a corporation" was heard without objection, but the court nonetheless reversed the defendant's conviction on the ground that "This is not a statement that the company was a corporation." 275 Ill. at 164.

In 1889, the General Assembly provided, "In all criminal prosecutions involving proof of the legal existence of a corporation, user shall be prima facie evidence of such existence." (Laws of 1889, p. 115; Ill. Rev. Stat. 1963, chap. 38, par. 737.) This statute foreclosed any holding that the introduction of a corporate charter was the "best evidence" of the corporation's existence and was therefore required. (Compare *State* v. *Merchant*, 48 Wash. 69, 92 Pac. 890, 892.) The statute apparently liberalized the law of evidence at the time of its passage, and it should not, in our opinion, preclude proof of the existence of a corporation by means other than those it specifies.

We believe that the time has come to re-evaluate the standards of proof established by earlier decisions. In other States, the ordinary rule is that the existence of a corporation may be shown by direct parol evidence. (*E.g., Edwards* v. *State*, 171 Ark. 778, 286 S.W. 935, 937; *Osby* v. *State*, 229 Miss. 660, 91 So.2d 748, 749; *State* v. *Taylor*, (Mo.) 274 S.W. 47, 49; *McCue* v. *State*, 124 Tex. Cr. 624, 65 S.W.2d 314, 315.) This court's rulings to the contrary have sometimes given criminal trials, in which no corporation was a party, the appearance of a *quo warranto* proceeding

against the victimized corporation. (See *Sykes* v. *People,* 132 Ill. 32, 49-53 (Mr. Justice Magruder, dissenting).) We believe that these rulings are inconsistent "with the spirit that has substituted, in criminal procedure as well as in civil, an interest in the significant rights of the litigants for a ritualistic concern with empty formalities." (*People* v. *Hill,* 17 Ill.2d 112, 119.) We therefore hold that in the absence of evidence to the contrary, the existence of a corporation may be shown by the direct oral testimony of a person with knowledge of that fact.

Bernard Johnson, the manager of the Altona branch of the lumber company, testified that he locked the company office at 5:00 P.M. on August 29, 1964, and that at 9:00 o'clock on the following morning he found that the glass in the back door had been broken, the safe had been opened, and one twenty-dollar bill and three ten-dollar bills, which he had placed in the safe, were missing.

Deputy Sheriff Allison testified that when he went to take the defendant from the hospital to the county jail, the defendant asked about his money. A sealed envelope, People's Exhibit 3, was brought up from the hospital office. The outside of the envelope contained the notation "$55.00." Allison testified that the defendant said that he did not care to open the envelope and that the amount of money marked on the envelope was correct.

The defendant objected to the admission of the envelope in evidence upon the ground that "there is no connection shown between the envelope and the alleged crime," and he objected to the admission of the contents of the envelope whether in a sealed or unsealed condition. The court offered to permit the defendant's attorney to unseal the envelope if we wished to do so. The defendant contends that it was error to admit this exhibit in evidence because it was not established that the envelope or its contents were taken from the Houghton Lumber Company, and he further contends that it was prejudicial to permit the envelope to be taken

to the jury room because its contents jingled when the envelope was shaken.

A defendant's possession of an amount of money comparable to that taken in a burglary is a relevant circumstance. (See, *e.g., People* v. *Stark,* 33 Ill.2d 616; *People* v. *Weaver,* 18 Ill.2d 108, 113; *People* v. *Allen,* 17 Ill.2d 55, 60-61.) This evidence is undoubtedly of diminished probative worth when the amount of money is not large and the denominations of bills in the defendant's possession are not specified, but we see no danger that the jury would attribute greater weight to the evidence than it merited. It had some tendency to show the defendant's guilt (see *People* v. *Bloom,* 370 Ill. 144, 148), and it was not prejudicial.

The State failed to produce the person who allegedly took $55 from the defendant and placed it in the envelope. However, "as against a party, a statement * * * of which the party with knowledge of the content thereof has, by words or other conduct, manifested his adoption or his belief in its truth" is admissible. (Uniform Rules of Evidence, Rule 68(8); see McCormick, Evidence, sec. 246.) The writing on the envelope was properly authenticated as that shown to the defendant, and deputy Allison testified to the defendant's statement that the amount recorded on the envelope was correct. This writing was therefore properly received as an admission of the defendant.

There was no testimony in this case that coins or other jingling material had been taken from the lumber company, and we fail to see how the fact that the envelope jingled when it was shaken could prejudice the defendant. "[W]hether exhibits should be taken to the jury room is within the sound discretion of the trial judge and his ruling will not be disturbed unless there was an abuse of such discretion to the prejudice of the defendant." *People* v. *Allen,* 17 Ill.2d 55, 62-63.

The defendant contends that without his statement that he entered the lumber company's building, the evidence was

insufficient to support his conviction. He therefore asks that if the statement is held involuntary, we reverse the conviction without remanding the case for a new trial. The evidence of the defendant's guilt included his arrest in the vicinity of the lumber company shortly after the burglary, what he characterized as an "altercation" with the village marshal at the time of the arrest, the possession of gloves, a screwdriver, and an amount of money greater than the amount taken in the burglary, and the fact that another set of licenses plates had been placed over the set on his car. The defendant attempted to explain some of these incriminating circumstances, but the jury was not required to credit his testimony. Moreover, it does not appear that the State would be unable to produce additional evidence upon a new trial. *Cf. People* v. *Ibom,* 25 Ill.2d 585, 595; *People* v. *Evans,* 24 Ill.2d 11, 15; *People* v. *Magnafichi,* 9 Ill.2d 169, 174.

This case will therefore be remanded for a new hearing on the admissibility of the defendant's confession. If the confession is held inadmissible, the trial court will vacate the judgment of conviction and grant the defendant a new trial. If the confession is held admissible, the trial court will enter a new judgment of conviction. See *People* v. *Stark,* 33 Ill.2d 616, 623; *People* v. *Jackson,* 31 Ill.2d 408, 411.

*Cause remanded, with directions.*